**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**SHERRY M. BOHANNON,**

**Plaintiff,**

**v.**

**COMMISSIONER OF SOCIAL SECURITY,**

**Defendant.**

**Civil Action 2:14-cv-305
Judge Edmund A. Sargus
Magistrate Judge Elizabeth P. Deavers**

**REPORT AND RECOMMENDATION**

Plaintiff, Sherry M. Bohannon, brings this action under 42 U.S.C. §§ 405(g) and

1383(c)(3) for review of a final decision of the Commissioner of Social Security

("Commissioner") denying her applications for social security disability insurance benefits and

supplemental security income. This matter is before the United States Magistrate Judge for a

Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 9), the

Commissioner's Memorandum in Opposition (ECF No. 16), Plaintiff's Reply (ECF No. 17), and

the administrative record (ECF No. 8). For the reasons that follow, it is **RECOMMENDED** that

the Court **REVERSE** the Commissioner of Social Security's nondisability finding and

**REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g).

**I.      BACKGROUND**

Plaintiff filed her applications for disability insurance benefits and supplemental security

income on October 5 and 20, 2010, respectively. She alleges that she has been disabled since

January 1, 2008, at age 30 (R. 167-75, 176-81), as a result of asthma, post-traumatic stress

disorder (PTSD), and depression.  (R. 207.)  Plaintiff's applications were denied initially and

upon reconsideration. Plaintiff sought a *de novo* hearing before an administrative law judge ("ALJ"). ALJ Robert M. Senander held a video hearing on November 21, 2012, at which Plaintiff, represented by counsel, appeared and testified. (R. 29-31, 33-47.) Carl W. Hartung, a vocational expert, also appeared and testified at the hearing. (R. 31-33, 48-50.) On May 3, 2013, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. 8-20.) On February 14, 2014, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. 1-5.) Plaintiff then timely commenced the instant action.

## II.    HEARING TESTIMONY

### A.    Plaintiff's Testimony

Plaintiff testified at the administrative hearing that she was living in an apartment with her three children. (R. 29.) She did not drive because she did not have a car, but she had driven in the past. Plaintiff stated that she had completed the eleventh grade and obtained a GED. (R. 30.) Plaintiff reported she last worked in 2008. (R. 31.)

Plaintiff testified that she has shortness of breath and chest pain that are mostly triggered by chemicals like cleaning products, changes in the weather, and stress. (R. 33-34.) Plaintiff estimated that she had five in-patient hospitalizations due to asthma since June 2009 (R. 34) and four outpatient emergency room visits due to asthma in 2012 (R. 36-37). She acknowledged that she went to the emergency room more often in 2009 because she was not being treated for her asthma by a physician on a regular basis at that time. Plaintiff testified that after she started receiving regular care from a doctor, she did not require emergency room treatment of her asthma on a regular basis. (R. 37.) At the time of the hearing, she was seeing a physician and

2

using a nebulizer machine and three inhalers. She uses two inhalers on a regular basis and one only as needed. (R. 38-39.)

When asked about her mental health, Plaintiff responded that she cries frequently and for no reason, and she has nightmares, mood swings, a loss of appetite, sleep disruption, and no interest in doing anything. (R. 40, 43.) She testified that she has crying spells "all day nonstop" on a daily basis. As a child, Plaintiff witnessed her mother's husband shoot her mother and cousin. (R. 41.) Plaintiff noted that she experiences constant hallucinations and hears voices. She also testified to suffering from suicidal thoughts and having difficulty concentrating. (R. 42.) She takes five medications and experiences irritability as a side effect. (R. 43.) She has problems remembering dates, appointments, and conversations. (R. 44.) She has difficulty with social interaction because she always thinks someone is judging her and loses interest in conversations. (R. 44-45.) Plaintiff also testified that she has hallucinations and crying spells because she witnessed, at about age five, her aunt "pull out her eye." (R. 45.)

Plaintiff testified to having five bad days per week in which she isolates herself in her room and is unable to do anything. (R. 46.) When asked for how long she has had at least three bad days per week, she responded "a month." When asked how many bad days per week she had from 2008 until the beginning of 2012, she did not understand the question. (R. 47.) She explained that her cousin takes care of her three minor children on her bad days. (*Id.*)

### B. <u>Vocational Expert Testimony</u>

Carl W. Hartung testified as the vocational expert ("VE") at the administrative hearing. The VE testified that Plaintiff's past jobs include working as a telemarketer, a sales associate, a home health aide, a hair stylist, and a collector. (R. 31-33, 48-50.)

3

The ALJ proposed a hypothetical regarding Plaintiff's residual functional capacity ("RFC") to the VE. Based on the RFC ultimately determined by the ALJ and Plaintiff's age, education, and work experience, the VE testified that Plaintiff could not perform her past relevant work. The VE also testified the hypothetical individual could perform approximately 5,567 light, unskilled jobs in the regional economy such as an assembler, hand packager, and mail clerk. (R. 48-49.)

When examined by Plaintiff's counsel, the VE testified that if Plaintiff would not be able to sustain employment if she were off task approximately 20% of the time, missed one day per week, or took four unscheduled breaks per work day. (R. 49-50.)

## III.  MEDICAL RECORDS

### A.  Physical Impairments

#### 1.  Grant Medical Center

In December of 2008, Plaintiff presented to the emergency room for shortness of breath. (R. 1020-22.) Her chest x-ray was normal, and she was diagnosed with bronchitis. (R. 1040, 1046.) December 5, 2010, Plaintiff presented to the hospital for shortness of breath; she was again diagnosed with bronchitis. (R. 1022-24.) On December 25, 2010, Plaintiff presented to the hospital for shortness of breath; she was diagnosed with asthma exacerbation. (R. 1025-26, 1041.) A chest x-ray taken was normal with no evidence of pulmonary disease. (R. 1045.)

#### 2.  Ohio State University Hospital East

Plaintiff presented to Ohio State University Hospital East ("OSU East") for asthma exacerbations in June, September, October, and December of 2009. (R. 294-356, 849-988, 996-1003.) In June, she reported that she had run out of her prescribed inhaler a few days before she

4

came to the emergency room with increased shortness of breath. (R. 355.) In September, Plaintiff stated that she ran out of her prescribed medications. The hospital notes indicated that she was admitted for asthma "secondary to noncompliance to meds." (R. 324, 329.) In October, treatment notes indicate that Plaintiff had been off certain medications within days of her discharge the previous month. (R. 345.) A chest x-ray taken in December 2009 was within normal limits. (R. 294, 996.)

A Pulmonary Function Test performed on February 10, 2011 showed FEV 1 (forced expiratory volume in 1 second) measured at 1.75 or 75% of predicted. FVC (forced vital capacity) measured at 2.91. Plaintiff was found to have a mild obstructive ventilatory defect. There was a significant response to bronchodilator suggesting reversibility of obstruction. Her lung volumes were within normal limits. (R. 301, 1010.)

Unrelated to this matter, Plaintiff was also seen in the Otolaryntgology Department at OSU East in October 2009 and was diagnosed with probable vocal cord dysfunction possibly related to acid reflex and/or stress. (R. 834-79.)

### 3.  OSU Family Practice

Dr. Liliana Gomez Medley, M.D. treated Plaintiff on two occasions, in October 2009 and January 2011, at an OSU Family Practice. (R. 358, 828-34.) On January 26, 2011, Dr. Gomez noted that Plaintiff "has not been compliant with treatment," "quit smoking a month ago," and "needs refills." (R. 828.) In February 2011, Dr. Gomez reported that Plaintiff needed to follow-up at least once every three months and "needs to use her inhalers to prevent going to the [emergency room] all the time." (R. 359.) Dr. Gomez also had ordered pulmonary function tests, which Plaintiff had not completed. (R. 359.)

5

### 4.    OSU Family Practice & Medical Center – Biopsy

Unrelated to this matter, Plaintiff was seen in 2012 at an OSU Family Practice and at OSU Medical Center regarding swelling and pain at an incision scar from a prior caesarean section. (R. 521-62, 638-827.) Dr. Peter Muscarella II performed a biopsy (R. 393-519), diagnosed the problem as a hypertrophic scar (R. 501), and referred Plaintiff to a plastic surgeon for treatment (*Id.*).

### 5.    State Agency Evaluation

On June 21, 2011, state agency physician Leon Hughes, M.D., reviewed the record and assessed Plaintiff's physical functioning capacity. (R. 63-65.) Dr. Hughes opined that Plaintiff could lift, carry, push, and pull up to 20 pounds occasionally and 10 pounds frequently; and either sit, stand, or walk for a total of about six hours in an eight-hour work day. (R. 63.) He also found that Plaintiff could frequently climb ramps or stairs but only occasionally climb ladders, ropes, or scaffolds. (R. 63-64.) Plaintiff was to avoid concentrated exposure to extreme heat, humidity, fumes, odors, dusts, gases, and poor ventilation. (R. 64.) In November 2011, William Bolz, M.D. reviewed the record upon reconsideration and essentially affirmed Dr. Hughes' assessment. (R. 87-101.)

### 6.    ChukwuEmeka Frank Ezike, M.D.

On March 2, 2013, Dr. ChukwuEmeka Frank Ezike, M.D. reviewed the record as a medical expert and completed Interrogatories. (R. 1048-57.) Dr. Ezike opined that Plaintiff could occasionally lift or carry 11-20 pounds and frequently lift or carry ten pounds. (R. 1048.) He opined that, in an eight hour workday, Plaintiff could sit for a total of six hours, and stand for four hours, and walk for three hours. Dr. Ezike also found that Plaintiff could, without

6

interruption, sit for two hours, stand for one hour, and sit for 30 minutes. (R. 1049.) Plaintiff

could only occasionally climb ladders or scaffolds. (R. 1051.) Plaintiff was found to be limited to

only occasional exposure to extreme cold or heat as well as dust, odors, fumes, and pulmonary

irritants due to asthma. (R. 1052.)

Dr. Ezike concluded that Plaintiff did not meet the requirements of any Listings and

provided the following notes as to his rationale:

> 3.02   –   PFT result not at listing level . . .
>       –   frequency of attacks and hospital
>          admissions not at listing level,
>          and is complicated by non-compliance

 (R. 1055 (formatting in original).)

**B.**    **Mental Impairments**

    **1.**    **Dublin Counseling Center**

Plaintiff received mental health treatment at the Dublin Counseling Center from October

2009 through at least October 2012, meeting with her doctor, her social worker, and therapists.

(R. 360-84, 566-632.) She initially complained of depression and PTSD.  Since she lost her job

in September 2008, her depression had gotten worse and she was thinking of hurting herself.

She found it hard to find a job. At the time of this assessment, she was homeless with her

children.  (R. 361.)  Lisa Brickert, the intake social worker, diagnosed Plaintiff with PTSD. (R.

370–71.) Plaintiff was recommended to CPST services to help link her to community resources

such as employment, housing, and income support. Ms. Brickert noted that Plaintiff needed to

learn coping skills to decrease her depression and anxiety to better function. (R. 367.)

Plaintiff was first assessed by psychiatrist Robert Fornal, M.D. on July 29, 2010. On November 17, 2010, Dr. Fornal reported that Plaintiff had been diagnosed with Major Depression and had only partially responded to treatment. He opined, "[c]urrently she has no vocational capacity because of persistent mood instability. I expect her to be unable to engage in employment for at least the next six months." (R. 360.)

On May 4, 2011, one of Plaintiff's counselors, Kristen Boudreau, PC, completed a medical functional capacity assessment for the Department of Job and Family Services. Ms. Boudreau found that Plaintiff was moderately limited in the following abilities: to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with general public, to ask simple questions or request assistance, to accept instructions and respond appropriately to criticism from supervisors, to respond appropriately to changes in the work setting, and to set realistic goals or make plans independently of others. Ms. Boudreau noted that Plaintiff would be employable. (R. 373-75.)

On October 25, 2012, Dr. Fornal opined that Plaintiff was markedly impaired in her abilities to understand and remember complex instructions, to carry out complex instructions, and to make judgments on complex work-related decisions. To support this assessment, he cited her lack of coping skills beyond simple withdrawal, noting that she has lost employment due to poor attendance related to this lack of skills. He explained, "If problems arise, she stays home." (R. 634.)   He also found that Plaintiff was markedly limited in her ability to interact

8

appropriately with the public and with her supervisors. To support this assessment, he states that she makes "fleeting eye contact," was "unable to sustain casual interaction [with] clients" at cosmetology school, and "stays verbally non-spontaneous." He notes that her cosmetology instructors stated that Plaintiff "works too slowly to be successfully employed." He also indicated that when Plaintiff is given corrective directions, she uses a withdrawal method to cope. (R. 635.)

### 2.    Sudhir Dubey, Psy.D.

On June 14, 2011, Dr. Dubey evaluated Plaintiff for disability purposes. (R. 385-91.) Plaintiff reported a history of both sexual and physical abuse since childhood and a poor relationship with her siblings. (R. 385-86.) She also reported that she had been receiving mental health treatment since 2009 and found it "helpful." (R. 386.) She noted that "[i]nteraction with other students was good. Interaction with teachers was . . . okay." (R. 386-87.) On mental status examination, Dr. Dubey found no unusual gestures. Mannerisms and motor activity were within normal limits. Facial expressions were tense and depressed, and behavior appeared to be overall depressed. She reported marijuana use a month ago. Plaintiff was found to be cooperative during the course of the interview. Eye contact was minimal. Her speech was coherent, and she appeared to be oriented to person, place, and time and evaluation situation. (R. 387.)

Plaintiff denied trouble concentrating, but reported trouble remembering at times. Her recall of remote past experiences and the recent past were good. She was able to recall five numbers forward and four numbers backwards; she was able to recall one of three objects after a five minute delay. (R. 387–388, 389.)  She had no problems with instructions for serial sevens,

although her performance on serial sevens was limited. (R. 389.) She did not require simple/multi-step questions to be repeated. (R. 389.)

Plaintiff described her mood in general as depressed, and she reported crying episodes, anxiety, restlessness, feeling discouraged about her life, and past suicidal ideations with a plan for suicide in 2009. (R. 388.)

Dr. Dubey described Plaintiff's history and information provided as "consistent with the available records," but opined that she was "inconsistent with the information [she] provided during the course of her interview. For example, she initially reported no friends or family contact, but then later stated her friends helps (sic) her at home and she has contact with her sister." He stated that her "general interaction and presentation style during the entire evaluation process was evasive as [she] appeared to magnify symptoms and [was] vague as to quality of life and function." (R. 388.)

Dr. Dubey concluded that, in a work setting, Plaintiff would be able to understand, remember, and carry out instructions; but would *not* be able to maintain attention, concentration, persistence, and pace to perform simple and multi-step tasks. (R. 390.)

### 3.    State Agency Evaluations

On June 21, 2011, after review of Plaintiff's medical record, Aracelis Rivera, Psy.D., a state agency psychologist, assessed Plaintiff's mental condition and opined that Plaintiff had moderate restrictions in her activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation of an extended duration. He determined that the evidence did not

establish the presence of "C" criteria. (R. 61.) Dr. Rivera found Plaintiff's allegations were partially credible. (R. 62.)

Dr. Rivera did not give great weight to Dr. Dubey's opinion, noting that "it is based on a one time eval[uation] and not completely consistent with" the medical evidence of record. Dr. Rivera concluded that Plaintiff appears capable of concentrating to perform simple tasks and only moderately limited in her ability to complete more detailed tasks. (R. 63.)

Dr. Rivera gave little weight to Dr. Fornal's opinion that Plaintiff had no vocational capacity due to persistent mood instability. Dr. Rivera concluded that "there appears to be no solid basis for this conclusion." (R. 63.)

In completing the MRFC,[1] Dr. Rivera opined that Plaintiff was moderately limited in the following abilities: to carry out detailed instructions, to maintain attention and concentration for extended periods, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and to adapt appropriately to changes in a work setting. (R. 65-66.) Dr. Rivera found that Plaintiff "is of estimated low average intellect" but "can [work] at a steady pace to complete simple tasks." (R. 65.)

In November 2011, Robelyn Marlow, Ph.D. reviewed the record upon reconsideration and essentially affirmed Dr. Rivera's assessment. (R. 87-101.)

---

[1]"MRFC" is a residual functional capacity which limits its consideration to mental capabilities.

## IV.   THE ADMINISTRATIVE DECISION

The ALJ issued his decision on May 3, 2013. (R. 11-20.) Plaintiff met the insured status requirements through December 31, 2013. (R. 13.) At step one of the sequential evaluation process,[2] the ALJ found that Plaintiff had not engaged in substantially gainful activity since her alleged onset date of January 1, 2008. At step two, the ALJ found that Plaintiff had the severe impairments of asthma, depression, and alcohol and marijuana abuse. (R. 14.)

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ specifically considered Listing 3.03, for asthma, and concluded that, "as opined to by . . . Dr. Ezike, the record does not establish a frequency of asthma exacerbations and hospital admissions, which would satisfy the criteria in this Listing," which is also complicated by Plaintiff's noncompliance with prescribed treatment. (R. 14.)

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. § 416.920(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can she perform her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can she perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

As for Plaintiff's mental impairments, the ALJ specifically considered Listings 12.04 and 12.09, and concluded that Plaintiff had not met the requirements of either. As to Listing 12.04, the ALJ found that the "paragraph B" criteria were not satisfied. The ALJ found:

> In activities of daily living, [Plaintiff] has mild restriction. . . . [She] reported that she is able to independently care for her personal hygiene needs . . . [S]he did not need help managing her home and finances . . . She is the primary caregiver for three minor children and *noted no difficulties in providing care for her children*[.]
>
> In social functioning, [Plaintiff] has moderate difficulties. . . .
>
> With regard to concentration, persistence or pace, [Plaintiff] has mild difficulties. . . . [She] has denied having trouble concentrating. . . . [Her] recall of remote past experiences and the recent past were . . . good. She was able to recall five numbers forward and four numbers backwards, had no problems with instructions for serial 7's, and did not need simple/multistep questions repeated. . . . [She] has reported no difficulties with managing her own finances, caring for three minor children, and making decisions for herself. . . . [She] was enrolled in college . . . and handling it well.

(R. 14-15.)

At step four of the sequential process, the ALJ evaluated Plaintiff's RFC. The ALJ found:

> After careful consideration of the entire record, the [ALJ] finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant should only occasionally climb ladders, ropes, and scaffolds and should avoid concentrated exposure to extreme heat, humidity, fumes, dusts, odors, and gases. Based on her mental status, the claimant should have no contact with the general public and only incidental contact with co-workers and supervisors.

(R. 15.)

13

To reach this determination, the ALJ considered the following evidence and made the following conclusions.

**Physical Impairments.** The ALJ stated that, according to Plaintiff's own testimony, once she started obtaining regular care for her asthma, she did not require emergency room treatment for asthma on a regular basis. He found that Plaintiff has not been compliant with recommended treatment, including follow-up appointments and medications, but when she has reported taking her medications routinely, she breathes better. The ALJ also notes that radiologic findings have failed to show any significant abnormalities. While a 2011 pulmonary function test indicated a pattern of mild obstructive ventilatory defect, there was a significant response to bronchodilator suggesting reversibility of obstruction. (R. 16-17.)

The ALJ assigned some weight to the opinion of Dr. Ezike, noting that there is "no documented clinical evidence to support" his restriction in standing or walking. The ALJ accorded "significant weight" to the portion of Dr. Ezike's opinion in which he limits Plaintiff to work in an environment where she could avoid concentrated exposure to heat, humidity, fumes, dusts, odors, and gases, as this takes into account her diagnosis of asthma and accommodates it. (R. 17.)

**Mental Impairments.** The ALJ described Plaintiff's hearing testimony regarding her alleged symptoms. The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but concluded that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." (R. 16.)

14

The ALJ noted that Plaintiff indicated on June 14, 2011 that she had been receiving counseling for depression and seeing a psychiatrist since 2009 and that treatment was "helpful," and that OSU treatment notes dated January 18, 2012 describe Plaintiff's depression as "stable." He states, "[m]oreover, [Plaintiff's] activities of daily living, which have included going to school, caring for three minor children, managing chores and finances, and being able to independently care for herself as well, suggest that [she is] not as mentally limited as she alleges." (R. 17.)

The ALJ accorded little weight to the opinion of Dr. Dubey, finding that his opinion is inconsistent with his own examination findings as well as (1) Plaintiff's testimony (as described by the ALJ) that she has no difficulties with managing her own finances, caring for three minor children, and making decisions for herself; and (2) Dublin Counseling Center progress notes indicating that Plaintiff was enrolled in college and handling it well. (R. 18.)

The ALJ accorded no weight to the November 2010 opinion of Dr. Fornal "because it concerns [Plaintiff's] mental status only at that time and not overall." The ALJ did not assign a specific weight to Dr. Fornal's October 2012 opinion, but stated that he found it to be "in direct contrast to the results of [Plaintiff's] psychological examination" by Dr. Dubey and inconsistent with Plaintiff's activities of daily living, including independently caring for her personal needs, caring for her children, managing her finances, making decisions for herself, and attending college. (R. 18.)

Relying on the VE's testimony, the ALJ determined that Plaintiff is unable to perform her past relevant work, but she is capable of making a successful adjustment to other work that exists

in significant numbers in the national economy. (R. 18-20.) He therefore concluded that Plaintiff

was not disabled under the Social Security Act. (R. 20.)

## V.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the

Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to

proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th CiR. 2009)

(quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th CiR. 2007)); *see also* 42 U.S.C.

§ 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by

substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is

defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486

F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir.

1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must

"'take into account whatever in the record fairly detracts from [the] weight'" of the

Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial

evidence supports the ALJ's decision, this Court defers to that finding 'even if there is

substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v.

Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.

1997)).

16

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI.    LEGAL ANALYSIS

In her Statement of Errors, Plaintiff raises four issues. First, Plaintiff asserts that the ALJ improperly weighed the treating source opinions of Dr. Fornal.  Second, Plaintiff contends that the ALJ erred by improperly evaluating the opinions of "an other medical source."  Next, Plaintiff argues that the ALJ failed to mention a substantial amount of evidence in the record, resulting in an inaccurate mental residual functional capacity.  Finally, Plaintiff asserts that the ALJ erred at Step 3 by not adequately explaining why Plaintiff did not meet Listing 3.03.

The undersigned addresses Plaintiff's argument regarding Listing 3.03 and then whether the ALJ improperly weighed the treating source opinions.  Because the undersigned finds that the ALJ failed to give good reasons for giving less than controlling weight to the treating source opinions, this Report and Recommendation does not address Plaintiff's remaining arguments.

### A.    Listing 3.03

Plaintiff argues that the ALJ failed to adequately explain why Plaintiff did not meet Listing 3.03., for asthma. That listing can be satisfied by (A) chronic asthmatic bronchitis, evaluated under the criteria for chronic obstructive pulmonary disease in Listing 3.02A (see below); or (B) a specified number of asthma attacks, as follows:

17

> Attacks (as defined in 3.00C), *in spite of prescribed treatment* and requiring physician intervention, occurring at least once every 2 months or at least six times a year. Each in-patient hospitalization for longer than 24 hours for control of asthma counts as two attacks, and an evaluation period of at least 12 consecutive months must be used to determine the frequency of attacks.

20 C.F.R. § Pt. 404, Subpt. P, App. 1 (emphasis added).

"Attacks" are defined in Listing 3.00(C) as:

> prolonged symptomatic episodes lasting one or more days and requiring intensive treatment, such as intravenous bronchodilator or antibiotic administration or prolonged inhalational bronchodilator therapy in a hospital, emergency room or equivalent setting. . . . The medical evidence must also include information documenting adherence to a prescribed regimen of treatment as well as a description of physical signs. For asthma, the medical evidence should include spirometric results obtained between attacks that document the presence of baseline airflow obstruction.

20 C.F.R. § Pt. 404, Subpt. P, App. 1.

Listing 3.02, for chronic pulmonary insufficiency, is satisfied by (A) chronic obstructive pulmonary disease with a FEV1 equal to or less than the values specified in the Listing or (B) chronic restrictive ventilatory disease with a FVC equal to or less than the values specified in the Listing. Plaintiff does not appear to dispute that her pulmonary function test (PFT) results do not satisfy the requirements of Listing 3.02. (20 C.F.R. § Pt. 404, Subpt. P, App. 1; *see* R. 301.)

Relying on Dr. Ezike's opinion, the ALJ concluded that Plaintiff had not satisfied the requirements of Listing 3.03. As stated above, the ALJ concluded that, "as opined to by . . . Dr. Ezike, the record does not establish a frequency of asthma exacerbations and hospital admissions, which would satisfy the criteria in this Listing," which is also complicated by

18

Plaintiff's noncompliance with prescribed treatment. (R. 14.) Plaintiff argues that Dr. Ezike's opinion pertained only to Listing 3.02, and did not address Listing 3.03.

As stated above, Dr. Ezike provided the following notes to support his opinion that Plaintiff did not meet the requirements for any listing:

> 3.02 – PFT result not at listing level . . .
> – frequency of attacks and hospital
> admissions not at listing level,
> and is complicated by non-compliance

(R. 1055.) Considering the format of Dr. Ezike's notes, as well as the requirements of Listing 3.02, the undersigned finds that it is clear that Dr. Ezike's notes do not pertain solely to Listing 3.02. Rather, because Listing 3.02 does not relate to frequency of attacks, it appears that Listing number "3.03" was inadvertently omitted from the first column of the second line of Dr. Ezike's notes. This interpretation corresponds to and is consistent with his notes regarding the frequency of asthma exacerbations and Plaintiff's noncompliance.

Plaintiff argues that, "even if [Dr. Ezike] was attempting to reference Listing 3.03," his "comment that the frequency of attacks and hospital admissions do not meet the listing . . . is factually false." Plaintiff states that she had at least eight asthma exacerbations in a twelve month period between 2008 and 2009. (ECF No. 9 at 21.) Even assuming the requisite frequency of attacks, however, the record is clear that such attacks were not "in spite of prescribed treatment," as required by Listing 3.03. (See R. 37 (Plaintiff acknowledged that she went to the emergency room more often in 2009 because she was not being treated for asthma on a regular basis at that time; after she started receiving regular care, she did not require emergency

room treatment on a regular basis); R. 324, 329, 345, 355 (hospital notes indicating noncompliance); C.F.R. § Pt. 404, Subpt. P, App. 1.)

While the ALJ's explanation regarding Listing 3.03 is less than clear, the undersigned finds that the record contains substantial evidence showing that Plaintiff does not satisfy the requirements of Listing 3.03. It is therefore **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors as to that issue.

### B. Weight of treating source opinions

Plaintiff argues that the ALJ failed to provide good reasons for assigning less than controlling weight to Dr. Fornal's treating psychiatric opinions.  She therefore maintains that the ALJ's decision is not supported by substantial evidence.

The ALJ must consider all medical opinions that he receives in evaluating a claimant's case.  20 C.F.R. § 416.927(c).  The applicable regulations define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(2).

The ALJ generally gives deference to the opinions of a treating source "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical filings alone . . ."  20 C.F.R. § 416.927(c)(2);  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009).  If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory

20

diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight." 20 C.F.R. § 404.1527(c)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

*Id.* Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion." 20 C.F.R. § 416.927(c)(2). Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010) (internal quotation omitted). The United States Court of Appeals for the Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45. Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 Fed. Appx. 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242).

There is no requirement, however, that the ALJ "expressly" consider each of the *Wilson* factors within the written decision. *See Tilley v. Comm'r of Soc. Sec.*, 394 F. App'x 216, 222 (6th Cir. 2010) (indicating that, under *Blakley* and the good reason rule, an ALJ is not required to explicitly address all of the six factors within 20 C.F.R. § 404.1527(c)(2) for weighing medical opinion evidence within the written decision).

Finally, the Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity. 20 C.F.R. § 404.1527(d). Although the ALJ will consider opinions of treating physicians "on the nature and severity of your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled to special significance. 20 C.F.R. § 404.1527(d); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

Plaintiff asserts that the ALJ failed to provide any good reason for assigning less than controlling weight to Dr. Fornal's opinions.[3] (ECF No. 9 at 8.) Plaintiff maintains that Dr. Fornal's opinions are well-supported by the evidence and are consistent with Plaintiff's activities of daily living as well as the opinion of Dr. Dubey. (ECF No. 9 at 9, 11.)

The Commissioner argues that Dr. Fornal's 2010 "opinion was conclusory and did not detail Plaintiff's specific abilities," and that "[s]uch an opinion is not entitled to special deference." (ECF No. 16 at 5 (citations omitted)). Because the 2010 opinion uses the word

---

[3] The Undersigned notes that the ALJ did not even identify Dr. Fornal as a treating physician or acknowledge his obligation to provide the reasons for failing to afford the doctor's opinions controlling weight.

"currently" and predicts that Plaintiff would be disabled for at least the next six months, the Commissioner also argues that "the ALJ properly concluded that this opinion was an evaluation of Plaintiff's mental state at the current time and not a long-term prognostication regarding Plaintiff's abilities." The Commissioner further implies that "the ALJ reasonably gave this opinion no weight" because it does not satisfy the twelve month duration requirement in 20 C.F.R. § 404.1509.

The ALJ's decision to provide no weight to the 2010 opinion because it purportedly only reflected Plaintiff's mental health at that time is not supported by substantial evidence. Even if the opinion concerned Plaintiff's mental health in 2010, the record makes clear that Plaintiff continued to have the same symptoms and continued to treat with Dr. Fornal. Indeed, two years later, Dr. Fornal completed a second evaluation and found Plaintiff to be markedly impaired in several respects. (R. 674-75.)

As for Dr. Fornal's 2012 opinion, the Commissioner acknowledges that the ALJ did not give the opinion a specific weight, but contends he "clearly" did not give it controlling weight. (ECF No. 16 at 6.) The Commissioner also maintains that substantial evidence supports the ALJ's conclusion that Dr. Fornal's 2012 opinion was "in direct contrast" to Dr. Dubey's findings.

To the extent the ALJ found Dr. Fornal's 2012 opinion inconsistent with other substantial evidence in the record, he failed to specify which findings he considered to be inconsistent. This reason, nonetheless, is not supported by substantial evidence. The ALJ noted that Dr. Fornal opined that Plaintiff was markedly impaired in her abilities to understand, remember, and carry out complex instructions and reasoned that these findings are inconsistent with Dr. Dubey's

23

notation that Plaintiff had no problem with instructions.  Dr. Dubey concluded, however, that, in a work setting, while Plaintiff would be able to understand, remember, and carry out instructions; she would not be able to maintain attention, concentration, persistence, and pace to perform simple and multi-step tasks. (R. 390.)  Drs. Fornal and Dubey's opinions are not inconsistent in this regard.

A review of the record makes clear that the ALJ failed to consider the entire record in assessing what weight to assign to Dr. Fornal's opinions.  For instance, the ALJ does no more than mention that Plaintiff received mental health treatment at Dublin Counseling Center and did not consider any of the treatment notes which spanned several years.  These treatment notes support Dr. Fornal's opinions.  Moreover, for example, the ALJ cited Plaintiff's activities of daily living, which the he described as including independently caring for her personal needs, caring for her children, managing her finances, making decisions for herself, and attending college.  (R. 18.)  While the ALJ repeatedly cites these activities in his decision, he misstates the record. The ALJ found that Plaintiff "is the primary caregiver for three minor children and noted no difficulties in providing care for her children." (R. 14.)    In 2011, however, Plaintiff was living in a homeless shelter with her children.  Moreover, Plaintiff testified that she has several "bad days" per week during which she isolates herself and is unable to care for her children. (R. 47.)

The ALJ also ignores significant evidence when he refers simply to a Dublin Counseling Center record stating that Plaintiff "was enrolled in college . . . and handling it well."  (R. 14.) While the ALJ cites Plaintiff's school enrollment as one of the activities inconsistent with Dr. Fornal's opinion, he fails to address Dr. Fornal's statements that Plaintiff was "unable to sustain

casual interaction [with] clients" at cosmetology school," "stays verbally non-spontaneous," and, according to her instructors, "works too slowly to be successfully employed."  (R. 635.)

All of the above-stated evidence constitutes relevant "evidence" under 20 C.F.R. § 404.1512  which must be considered by the ALJ.  Accordingly, the ALJ should have explained why this evidence was ignored.  *See Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 379 (6th Cir. 2013) (finding that where the ALJ discounted a treating source's opinions "largely due to their alleged lack of consistency with the record as a whole," some explanation should have been given for failing to discuss a large portion of evidence that lent support to the treating source's opinions).

The Undersigned therefore cannot conclude that substantial evidence supports the weight assigned to Dr. Fornal's opinions and the ALJ's ultimate nondisability finding.  Further, the ALJ's violation of the treating source rule was not harmless error.  *See Wilson*, 378 F.3d at 547 (finding harmless error where the treating source's opinion was patently deficient, where the ALJ's decision was consistent with the treating source's opinion, or where the ALJ's decision met the goal of Wilson's good reason requirement).

On remand, proper analysis of the entire record might not support giving controlling weight to the opinions of Dr. Fornal.  Even if Dr. Fornal's opinions are not entitled to controlling weight, they must still be weighed in accordance with the prescribed regulations.  *Gayheart*, 710 F.3d at 380.  Given the nature of his treatment relationship with Plaintiff, his detailed treatment notes, and the supportability and consistency of his opinions with the record evidence, any subsequent ALJ must provide a clear explanation, supported by substantial evidence, for the weight assigned to Dr. Fornal's opinions.

In sum, in weighing the medical evidence, the ALJ failed to consider portions of the record and mischaracterized other evidence in the record.  Remand is therefore appropriate.  This finding obviates the need for in-depth analysis of Plaintiff's remaining assignments of error.  Thus, the Court does not resolve the alternative bases Plaintiff asserts to support reversal and remand.  The Court notes, however, that Plaintiff raises additional contentions of error that may have merit.[4]  Accordingly, the Commissioner may consider the remaining contentions of error, if appropriate, on remand.

## VII.    CONCLUSION

Due to the errors outlined above, Plaintiff is entitled to an order remanding this case to the Social Security Administration pursuant to Sentence Four of 42 U.S.C. § 405(g).  It is therefore **RECOMMENDED** that the Court **REVERSE** the Commissioner of Social Security's non-disability finding and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g) for further consideration consistent with this Report and Recommendation.

## VIII.    PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b). The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge

---

[4] For instance, the ALJ failed to mention the opinions of four state agency experts.

and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

August 10, 2015                                         /s/ *Elizabeth A. Preston Deavers*
                                                    Elizabeth A. Preston Deavers
                                                    United States Magistrate Judge